## Case No. 7,357.

## The JOHN MARTIN.

[2 Abb. U. S. 172.] [1]

District Court, E. D. Michigan. April Term, 1870.

[1] [Reported by Benjamin Vaughan Abbott, Esq., and here reprinted by permission.]

A. Russell, for libelant.
Moore & Griffin, for claimants.

LONGYEAR, District Judge. The proofs as to what the contract was, and in relation to the time of actual service, entirely agree as to the wages per month, and as to when the service commenced and when it ended, and entirely accord with the allegations in the libel. As to what the contract was in relation to the terms of service, whether it was a simple hiring at one hundred dollars per month, indefinite as to the length of time it was to continue, or whether it was a part of the agreement that the libelant should serve the entire season of navigation, as alleged in the answer, the testimony is contradictory.

The proofs upon this point stand entirely upon the unsupported testimony of William Livingstone, Jr., one of the claimants, on the one side, and of the libelant, on the other. Neither is corroborated, and as both stand before the court on an equal footing as to interest and credibility, the testimony of the one exactly balances that of the other. This allegation, therefore, as to length of time libelant was to serve, is not made out, and the contract must stand as set up in the libel: viz: a hiring at one hundred dollars per month, indefinite as to time of service beyond what those terms signify. Those terms signify: 1. A hiring for one month at least. 2. If the service is continued beyond the month without any new agreement, it will be implied that it is at the same wages, and of course for another complete month, and so on from month to month. Such, then, was the agreement.

Under this agreement, libelant served from March 16, 1868, to September 23, 1868, both days inclusive, five months and eight days, which, at one hundred dollars per month, amounts to six hundred and twenty-six dollars and sixty-six cents. Libelant acknowledges the receipt of five hundred and ten dollars, which leaves a balance of one hundred and sixteen dollars and sixty-six cents, which amount, with interest from September 23, 1868, to date of decree, the libelant is entitled to recover, unless he is debarred of the same by the matters set up and proven by the respondents.

It appears in the proofs that the tug did not go into commission until April 21, 1868, a month and six days after the service of libelant commenced; and it is claimed that for that time libelant has no lien for his wages, his claim, if any, being against the owners in person, and not against the tug. There is no allegation in the answer on which to found this claim, and it must therefore be disregarded.

In this view of the question, it is of course unnecessary to consider what would have been its effect if it had been set up. The defense set up is forfeiture of wages, in consequence of disobedience of orders and desertion. It appears that the tug was engaged in towing vessels between Lakes Erie and Huron, and that on September 23, 1868, as the tug was coming down with a tow from Lake Huron, on its way to Lake Erie, as she was approaching Detroit, and some two or three miles distant, libelant came to the master, and asked him if he was going to stop at Detroit, and said he had to get off there, as he had had a better offer. On being told by the master that he should not stop at Detroit, libelant said the boat should not pass Detroit; that he would stop the engine; but did not carry his threat into execution. He and the master had some words. The master called the mate and one of the men as witnesses, and said to libelant, "I want the boat to go through to Lake Erie—stop her at your peril." Then libelant went to his room, and the tug went on with its tow to Lake Erie, the second engineer working the engine. Did not stop at Lake Erie to look for a tow, but came back light, on account of the difficulty with libelant, and landed him at Detroit. Another engineer was found and employed within two or three hours, and the tug went on to Lake Huron, and the next day procured a tow down.

Libelant testifies that one reason of his leaving was, that from March to September he had no change of bed-clothes, and the tug was an old boat. The master and owner both testify, that they never before heard any fault found by libelant with his bed or board on the tug. The only reason he gave for quitting was that he had a better job.

Livingstone testifies that libelant came to him for his pay twice—once next day after he quit, and once some five or six weeks afterwards, and was refused on both occasions, for the reason that he quit as he did. Libelant testifies that when he went for his pay, and was refused, he offered to return to the boat, but does not state on which occasion. Livingstone says it was on the second occasion, and after libelant had lost the situation he left the tug to obtain.

Up to the time libelant demanded to be put ashore at Detroit, as above stated, he had always obeyed orders and performed his duties well. The earnings of the tug about

that time were about one hundred and fifty dollars per day. No shipping articles were signed by libelant, and the agreement was not in writing; no entry of the desertion was made upon the log-book or list of the crew, nor were any of the statutory formalities observed; and therefore the defense of deserting must be made out, if at all, under the maritime law, independent of the statutes upon the subject.

It is claimed, on behalf of libelant, that desertion is a statutory offense, and can be proved only in the manner and form prescribed by statute; or in other words, that the statutes upon this subject have by implication repealed the maritime law of desertion.

In regard to repeal of laws by implication, the rule is this: that a general statute, without an express repealing clause, will not repeal an existing law upon the same subject, unless the two are irreconcilably inconsistent. The leaning of courts is against the doctrine. The two laws will be reconciled, if possible, so that both may stand. Seug. St. Const. Law, 123, 126.

Now, by the maritime law, briefly stated, desertion, to work a forfeiture of wages, must be not only an absence without leave, or in disobedience of orders, but with the intention not to return—to abandon the vessel and the service. Cloutman v. Tunison [Case No. 2,907]; 1 Conk. Adm. 129.

By the statute (Act 1790, 1 Stat. 133, § 5), a forfeiture of wages is worked by an absence without leave for forty-eight hours at one time, whether it was with or without the intention to return. The statute also imposes additional penalties, viz: forfeiture of the seaman's goods and chattels, and payment of damages.

There is no inconsistency in these two laws. By both, the absence must be without leave, and all antecedent wages and advances are forfeited. If the intention not to return exists, and forfeiture of wages alone is sought, then the maritime law is sufficient, and may be resorted to; but if such intention cannot be shown, and an absence of forty-eight hours at one time can be; or if a forfeiture of goods and chattels and payment of .damages is sought in addition to forfeiture of wages, then a statutory desertion must be made out; or, in other words, there is both a statute desertion and desertion by the maritime law. If the former is relied on, then the statutory proof must be made; otherwise, not.

It is true that the contrary doctrine was held for a number of years by some of the federal courts, particularly by the district courts for the Southern district of New York and Eastern district of Pennsylvania, as appears by the cases cited by the learned counsel for libelant, and other cases. See The Cadmus [Case No. 2,280]; The Martha [Id. 9,-144]; The Elizabeth Frith [Id. 4,361]; The Union [Id. 14,347]. Also, Wood v. The Nimrod [Id. 17,959]; Snell v. The Independence [Id. 13,139]; Knagg v. Goldsmith [Id. 7,872].

I think it will be found that nearly, if not quite all the decisions upon the point, hold the doctrine here contended for, and even Judge Betts, who made the decisions above cited [The Cadmus, The Martha, The Elizabeth Frith, The Union], some ten years after the last of those decisions was made, came around squarely upon this doctrine, and in the case of The Osceola [Case No. 10,602], made use of the following language: "The statutory evidence is necessary to convict a seaman of a desertion which carries a forfeiture of wages when not shown to be willful, and with intention not to return to the vessel. The desertion punished as an offense by the maritime law, is defined in the same terms, and established by the same process, as it was prior to the act of July 20, 1790." And I think it may be considered the established doctrine, by authority as well as on principle, that the act of 1790 did not repeal the maritime law of desertion. See 2 Pars. Shipp. & Adm. pp. 102, 103, note 2; 1 Conk. Adm. 129, 131; 3 Kent, Comm. 198; Cloutman v. Tunison [supra]; Coffin v. Jenkins [Case No. 2,948]; The Cadmus v. Matthews [Id. 2,282]; The Union v. Jansen [Id. 14,348]; Burton v. Salter [Id. 2,218]; The Rovena [Id. 12,090]; Piehl v. Balchen [Id. 11,137]; The Swallow [Id. 13,664]; The Crusader [Id. 3,456]; Jameson v. The Regulus [Id. 7,198].

But there is another fatal objection to the proposition under consideration as applicable to the present case. The seamen or mariners who are liable to the statutory forfeiture are described in section 5 of the act of 1790 as follows: "Any seaman or mariner who shall have subscribed such contract as is hereinbefore described."

The cases in which such contract is required, and the nature of the contract, are prescribed in the first sentences of the act, in the following words: "Every master or commander of any ship or vessel bound from a port of the United States to any foreign port, or of any ship or vessel of the burden of fifty tons or upward, bound from a port in one state to a port in any other than an adjoining state, shall, before he proceed on such voyage, make an agreement in writing or in print, with every seaman or mariner on board such ship or vessel, * * * declaring the voyage or voyages, term or terms of time for which such seaman or mariner shall be shipped."

Now in this case, the vessel is a tug, engaged in towing vessels between Lakes Erie and Huron, through the Detroit and St. Clair rivers, and over the St. Clair flats. She was from the port of Detroit, in the state of Michigan, but was not bound to "any foreign port," and although a vessel of upwards of fifty tons burden, she was not bound to a "port in any other than an adjoining state." She, in fact, was not bound to any port whatever. Her destination and employment was almost exclusively out upon the open water. It is true, in the prosecution of her occupation, she might

and might not run into Canadian waters. or stop at points on the Canadian shore for wood or other supplies, as it is shown that she did at Malden, on September 23, on her way back from Lake Erie to Detroit, but clearly this does not bring her within the description of vessels to which the statute is intended to apply. It is said that she also frequently ran into waters and sometimes took her tows into ports in the state of Ohio; but Ohio is an adjoining state, and therefore not within the statute.

The statute was intended to apply to vessels engaged in foreign commerce, and inter-state commerce, other than between adjoining states, and of course not to a case of this kind. See Milligan v. The B. F. Bruce [Case No. 9,602]. The act of 1856 (11 Stat. 62, § 25) must be construed together with the act of 1790, in pari materia, and as constituting part and parcel of the same general system, and therefore the remarks above made in relation to the act of 1790 will apply with equal force to that of 1856. Was there, then, a desertion by libelant, within the meaning of the maritime law? As we have already seen, absence from the vessel without leave, and with the intention not to return, are essential elements, although not all the elements of the offense. That these elements existed in this case I think is clearly made out by the proofs. It cannot be said that because the master brought libelant to Detroit, and put him ashore, that therefore libelant did not quit without leave. It clearly appears that the master was compelled to do this in consequence of the conduct of the libelant, and in order to enable him to continue the prosecution of the business of the tug. Beginning with the demand of libelant when approaching Detroit, to be put ashore. followed as it was by his quitting his post and going to his room. leaving the engine to be worked by his second, or not at all, and his refusal to stay and work the engine at Lake Erie till the tug could pick up a tow and bring it back, thus compelling the master, against his will, to abandon the enterprise and put back into the home port to obtain an engineer, and libelant's finally leaving the vessel at Detroit to accept an engagement, as he said, upon another vessel, constituted but one act, and that act is clearly desertion, so far as absence without leave, with intention not to return, is essential to make out the offense.

But it is said that desertion can only take place during a voyage. This is no doubt correct as a general rule. The term "voyage." however, as applied to vessels engaged in foreign and inter-state commerce within the meaning of the maritime law, is clearly inapplicable to a tug. making short trips, generally not from port to port, but from one body of water to another, merely furnishing the motive power to other vessels themselves bound on a voyage. not taking on freight at one port and delivering it at another. but picking up its burdens upon the water, and wherever its aid is invoked, and dropping them again upon the water. It would be a misnomer to apply the term "voyage" in the sense of the maritime law to such trips.

The reason of the rule that desertion can take place only during a voyage, applied to a case like the one under consideration, results in this: that desertion can take place only during the term of service agreed upon, whether that be for the entire season of navigation, or for specified time.

But, as applied to the facts in this case, it can make no difference whether a trip is regarded as a voyage or not, because, in view of the position above assumed. that the entire conduct of libelant, commencing with his demand to be put ashore at Detroit, and ending with his leaving the vessel, was but one act of desertion, the desertion did take place during a trip or voyage, if we choose so to call it.

Notwithstanding all this, however, if libelant had, as is contended in his behalf, a legal right to terminate his engagement at any moment, and consequently to make the demand he did. and to enforce it as he did. then of course there was no desertion.

As we have already seen, the hiring was by the month, and libelant left at the end of eight days of the month in which he left. An agreement to pay by the month cannot be construed into an agreement to pay by any less period.

The monthly service and the monthly wages are indivisible, and both by the admiralty and the common law, if the service is abandoned during the month without justifiable cause the obligation to pay for past services is destroyed.

The common law courts, after a long contest have, however, somewhat ameliorated this rule, so that they will now allow a recovery for what the services are actually worth, not beyond the contract price. subject to a set-off or recoupment for damages resulting from the non-performance.

Libelant has not chosen to adopt this course, however, but has chosen to arrest the vessel in a court of admiralty, and submit his rights to be decided on the principles of the admiralty law, and the owners insist that the rights. shall be determined by the strict rules of that law. By that law, libelant had no right to leave till the end of the month, without justifiable cause. See The Swallow [Case No. 13,664].

Had he such cause? He says one reason of his leaving was, that his bed was not changed during the whole six months and upwards that he was on the tug, and the tug was an old boat; but he made no complaint of that kind during the whole six months. He did not give these as reasons for leaving. but gave another and a different reason at the time he left; and he did not mention it in his testimony as first given. although he was asked his reasons for leaving. I cannot believe, therefore, that even if the facts

sworn to by him existed, they constituted any part of the cause of his leaving. It may be said that the hiring being by the month, libelant will forfeit only his wages for the month in which he left. A moment's reflection will show the unsoundness of the position. The hiring being by the month, either party could terminate the contract at the end of any month; but until it was so terminated, the service was by virtue of the original agreement, and was one entire thing.

But it is claimed that libelant offered to return to the vessel and resume his position as engineer. An offer to return within a reasonable time, and before the place has been filled by another, will, as a general rule, avoid the forfeiture. See 2 Pars. Shipp. & Adm. 99, and cases cited in Nolen, 4, 6; also, The Philadelphia [Case No. 11,084].

Libelant testifies that when he called on the owners for his pay and was refused, he offered to return, but he does not state when this occurred. Livingstone, one of the owners, testifies that libelant called twice for his pay—once the next day after he left, and again some five or six weeks after—and that it was upon the last occasion that he offered to return. As this is not inconsistent with libelant's statement, it must be taken to be the truth. This was not within a reasonable time, and another engineer had been engaged, and was then occupying the position. The forfeiture was, therefore, not avoided by the offer to return.

It is true the kind of service under consideration does not call for the same rigorous application of the law as ocean service, because there the consequences of desertion may be vastly more serious. The court may in its discretion alleviate the rigors of the general rule, and in view of mitigating circumstances, may impose a less penalty than that of entire forfeiture of wages. But I fail to see any mitigating circumstances in this case. They are, rather, of an aggravated character. When the tug is in the midst of a trip, with several vessels in tow. and at a point, and at a time when it might and probably would cause the tug to be mulcted in damages, and the loss of the towage, if she should stop to look up another engineer, this man, without any previous notice, and without any cause other than to accomplish his own advantage, suddenly proposes to leave the vessel, and demands that the tug shall stop and put him ashore; and to enforce his demand, defiantly threatens to stop the engine; and when he is overawed from doing this by the orders and counter-threats of the master, he goes to his room, and refuses to, or at least does not further discharge his duties, and thus compels the master to return and put him ashore. This seems to me a case truly in which the law should be rigorously applied. A decree must be entered dismissing the libel, and for costs to claimants, to be taxed.